## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **Civil Action No.** |
| **c/o United States Attorney's** | ) | |
| **Office** | ) | |
| **Judiciary Center Building** | ) | |
| **555 4th Street, N.W.** | ) | |
| **Washington, DC 20530,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ALL PROPERTY IN/UNDERLYING** | ) | |
| **E-GOLD ACCOUNT NUMBERS:** | ) | |
| | ) | |
| **808080, 808081 AND 808082,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully states as follows:

1.      This is a civil action, *in rem,* brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of any property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 and 1960, or any property traceable to such property. This civil action, *in rem*, also seeks to enforce the provisions of 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of any property which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" or a conspiracy to commit such offense.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355(a).  Venue is established by virtue of 28 U.S.C. §§ 1355(b), 1391(b) and 1395.

3.      This civil action, *in rem*, for forfeiture is governed by Title 18, United States Code, Sections 981 and 983, and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

## DEFENDANT PROPERTY

4.      The defendant property is:  All property, accounted for as an amount of "e-gold" in, or underlying, e-gold account(s) 808080, 808081 and 808082, on or about April 26, 2007 and May 4, 2007, and now reflected as U.S. dollars.  The E-GOLD operation records the individual or entity opening or directing the e-gold account(s) related to this forfeiture matter as:  **1mdc, 1mdc operations, 1mdc "BAIL IN" sweep account, or 1mdc assets**.

5.      On or about April 25, 2007 and/or May 4, 2007, seizure warrants were issued by this Court authorizing seizure by federal law enforcement authorities of the property accounted as e-gold and contained in or held on deposit in the e-gold account(s) numbered and identified as indicated above.  These warrants required entities operating the E-GOLD system – Gold & Silver Reserve, Inc./OmniPay/e-gold, Ltd. – to convert or exchange the relevant e-gold into funds denominated as United States currency.  Law enforcement officers served the warrants at the offices of Gold and Silver Reserve, Inc., on or about April 26, 2007 and on or about May 4, 2007, and left copies of the warrants with Douglas Jackson, or other company officials, on each occasion.  The defendant property herein was seized pursuant to one or more of these warrants.

6.      Post-conversion, the U.S. dollar value of the property recovered pursuant to the

warrant(s) concerning the e-gold account(s) at issue here was **$380,636.60**.

7.    The defendant property is now in the custody of, and under the control of, the United States Department of the Treasury, in Washington, DC.

## BASES FOR FORFEITURE

8.    The defendant property was seized from one or more accounts maintained by the "E-GOLD" operation, which is a private, so-called "digital" or "electronic" system for transferring funds through the Internet using accounts opened and accessed through the Internet.

9.    The E-GOLD operation is primarily managed and operated from offices and computers located in Florida by two entities, e-gold, Ltd. and Gold & Silver Reserve, Inc. ("GSR"), and three individuals, Douglas Jackson, Barry Downey, and Reid Jackson. (Collectively, herein referred to as:  "E-GOLD" or "the E-GOLD operation" or "the E-GOLD system").

10.    The E-GOLD operation is a so-called "digital currency" money transmission/payment system that makes use of the Internet and a website with the domain name www.e-gold.com.  Working in conjunction with "digital currency exchangers," the E-GOLD operation makes a so-called "digital currency" termed "e-gold" available to domestic customers in every state and the District of Columbia, as well as to foreign customers, as a mechanism for quickly moving money to others, using the Internet.  Such movements are accomplished upon conversion of funds denominated in certain national currencies (including U.S. dollars) into "e-gold" that is put into web-based accounts where the e-gold can be transferred among accounts and, thereafter, back into funds denominated  in national currencies.  The E-GOLD operation began in about 1996 and represents itself as one of the most popular and prominent "digital

-3-

currencies" available.

11.    The E-GOLD operation, by operating and maintaining the website identified above and other websites, and with the assistance of so-called "digital currency exchangers," conducts an operation that allows account holders to move funds into and through the E-GOLD system, and out of the E-GOLD system, thereby causing money to be transmitted through the E-GOLD operation, for a fee.

12.    The E-GOLD operation, its own digital currency exchanger, OmniPay, and third-party digital currency exchangers operating as part of the E-GOLD operation have, historically, been willing to work together to convert third parties' funds into, and out of, the E-GOLD system, from and into funds denominated as national currencies, without questioning the ownership, source or intended use of the funds or of the e-gold to be converted back into funds. As a result, e-gold has been widely accepted as a mechanism for funding transactions involving credit card and identification fraud, fraudulent "high-yield" investment programs, and other investment scams, and child exploitation.  At the same time, e-gold has not been widely accepted for use by large or mainstream vendors.

13.    The E-GOLD operation's "digital currency" is purportedly backed by precious metals and is offered to users as another option for conducting on-line funds transfers.

14.    According to GSR, it issues all e-gold and all e-gold is backed by gold bullion that is stored outside the United States.  According to GSR, it was necessary to sell gold bullion reserves to effectuate the conversion of e-gold into national currency in accordance with the seizure warrants served upon it.

15.    Digital currencies are generally marketed as offering global acceptance without

-4-

the need for conversion between national currencies, and are valued at fluctuating rates tied to the price of a particular precious metal, most typically gold. Individuals or entities are willing to accept e-gold in lieu of a national currency, to effect transfers of funds between individuals or entities for private purposes, trusting that they can redeem the value accounted as e-gold for national currency through the network of digital currency exchangers. While technically speaking, an account holder who has digital currency may have some right to redemption of the actual precious metal backing the digital currency, digital currency users typically convert their value into a national currency, through use of a digital currency exchanger, when such users want to take value out of the on-line funds transfer system.

16.    There are four primary steps involved in the business of transferring funds denominated as national currencies through the E-GOLD system (using e-gold): (i) opening an e-gold account over the Internet with the E-GOLD operation; (ii) providing national currency (or funds denominated as a legal tender) to a person (individual or entity acting as an exchanger) in return for the exchanger's agreement to fund the newly created e-gold account with e-gold the exchanger already controls; (iii) transferring e-gold from the newly-funded e-gold account to another's e-gold account; and (iv) exchanging the e-gold transferred into that account back into national currency or funds denominated as national currency that are directed out of the E-GOLD system.

17.    In addition to the party operating the website by which digital currency accounts are opened and accessed, several parties are involved in the E-GOLD operation's transfer of funds, including: (1) the E-GOLD customer who provides funds to be transferred using the E-GOLD system; (2) the eventual recipient of the transferred funds (another E-GOLD customer);

and (3) one or more digital currency exchangers (who typically profit from the conversion process).

18.     The digital currency exchangers are an integral part of the liquidity and reach of the E-GOLD operation. Some of the digital currency exchangers have been sponsored by the E-GOLD operation on its website and receive discounted rates for the e-gold they purchase to operate their businesses within the E-GOLD system.

19.     The E-GOLD operation has its own digital currency exchange service, too, which it calls "OmniPay." OmniPay provides customers with a mechanism to convert national currency into e-gold, and e-gold into national currency. The home page of the OmniPay website has described OmniPay's three primary services as follows:

> 1.     InExchange Service. The InExchange service changes national currency into a value associated with a particular e-metal.
> 2.     M2M Service. The M2M service transfers value from one e-metal account to another e-metal account.
> 3.     OutExchange Service. The OutExchange service changes the value in an e-metal account to national currency.

20.     The terms "InExchange" and "OutExchange" are terms used by the E-GOLD operation to explain the operation. For example, account holders within the E-GOLD operation can add value (reflected as e-gold) to their accounts via OmniPay's "InExchange" service, which has permitted a user to send funds denominated in a national currency to an OmniPay account at a bank. In conducting an InExchange, upon OmniPay's receipt of funds denominated in a national currency, such as U.S. dollars, OmniPay moves a corresponding amount of e-gold from an account it operates in the E-GOLD system to the account to which it is directed by the sender of the funds. Similarly, but in reverse, OmniPay (or another digital currency exchanger)

conducts an OutExchange by accepting another's transfer of e-gold into the digital currency

exchanger's account within the E-GOLD operation in return for the digital currency exchanger's

willingness to provide to the other currency (or a check or a bank wire) with a value

corresponding to the amount of e-gold exchanged, but now denominated not as e-gold, but in a

national currency.

21.     Users around the world can register for a free E-GOLD account via the E-GOLD

website and fund their account through a third-party digital currency exchanger or through E-

GOLD's own exchange service, OmniPay.  Once open and funded, account holders can access

their accounts through the Internet and conduct transactions with other parties anywhere in the

world.  The E-GOLD operation advertises on its website that it is "an alternative Internet

payment system" that "empowers people to use gold as money."  The E-GOLD operation

advertises its service as "Better Money," and "Internet Payments 100% backed by Gold."

22.     The digital currency termed "e-gold" can be traded among online account holders

using the Internet.  With only a valid e-mail address, a person can obtain an account in the E-

GOLD system that the person can use to send and receive any amount of e-gold to/from other

holders of accounts in the E-GOLD system, anywhere in the world, anonymously,

instantaneously, and irreversibly.  Use of the E-GOLD operation has become a popular

mechanism for transferring money, with the assistance of a network of website operators and

digital currency exchangers, to support a multitude of criminal financial endeavors, including the

endeavors that render the defendant property forfeitable in this case, and to hide the proceeds of

such criminal endeavors.

23.     The E-GOLD operation has acknowledged that it functions to provide remote

payments capabilities to individuals who have been excluded from the traditional banking system, and it functions as a mechanism to transfer money on behalf of the public, using the Internet, for a fee.

24.    The e-gold that existed in the above-identified e-gold account(s) was involved in, derived from or traceable to proceeds of criminal activity and was used, or was intended to be used, in part, to pay fees to the E-GOLD operation for using its services to transmit funds through the E-GOLD system and to launder the proceeds of criminal activity.

25.    As further set forth in the **Affidavit** attached hereto and incorporated by reference herein, the e-gold accounts listed above were opened by, or on behalf of, individuals or entities that used the accounts and the E-GOLD operation to engage in and/or conspire to engage in financial transactions that permitted the individuals and/or entities, by themselves and in conspiracy with others:  (1) to accumulate proceeds of "specified unlawful activity" ("SUA"); (2) to engage in financial transactions with the intent to promote the carrying on of SUA; and (3) to engage in financial transactions with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of SUA.  See Affidavit in Support of Complaint, attached hereto.

### *Money Transmitting Laws*

26.    Under 18 U.S.C. Section 1960, it is a felony to conduct a money transmitting business without the appropriate state license (in a state that has a licensing requirement and punishes such operation as a misdemeanor or felony) or federal registration, or when it otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or intended to be used to promote unlawful activity.  The

majority of States, including Florida, and the District of Columbia, require money transmitting

businesses to obtain a license and comply with the other regulatory requirements that apply to

such licensed entities, and punish the unlicensed operation of a money transmitting business as a

misdemeanor or felony.  Likewise, the federal government requires money transmitting

businesses to have registered with the Financial Crimes Enforcement Network (FinCEN), a

bureau of the Department of Treasury, by December 31, 2001, if they were in existence before

that date, and, otherwise, within 180 days after the date the business was established.

27.    The term "money transmitting" under Section 1960(b)(2) includes "transferring

funds on behalf of the public by any and all means including but not limited to transfers within

this country or to locations abroad by wire, check, draft, facsimile, or courier."

28.    In addition to the definition of "money transmitting" contained in 18 U.S.C. §

1960, section 5330 of Title 31 defines a money transmitting businesses.  To come within the

definition of a "money transmitting business" under Title 31 U.S.C. 5330(d)(1), three

requirements must be met:  First, the business must provide "check cashing, currency exchange,

or money transmitting or remittance services." 31 U.S.C. 5330(d)(1)(A).  In this case, the E-

GOLD operation provides money transmitting or remittance services.  Second, the business must

"be required to file reports under section 5313" of Title 31 of the U.S. Code.  The E-GOLD

operation is required to file reports under section 5313(a) under circumstances that the Secretary

may prescribe because it is a "financial institution" within the meaning of that provision.  See 31

U.S.C. 5312(a)(2)(R) (defining "financial institution" to include "a licenses sender of money or

any other person who engages as a business in the transmission of funds, including any person

who engages as a business in an informal money transfer system or any network of people who

-9-

engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institution system[.]").  Third, the business must not be a "depository institution" (as defined in section 5313(g)).  31 U.S.C. 5330(d)(1)(C).  The E-GOLD operation is not a depository institution within the meaning of section 19(b)(1)(A) of the Federal Reserve Act.

29.     The E-GOLD operation constitutes a money transmitting business.

30.     When the defendant property was involved in the E-GOLD operation, that operation conducted business in the District of Columbia, in Florida and in other states, and neither E-GOLD, Ltd., Gold & Silver Reserve, Inc., nor OmniPay, had a license to operate as a money transmitting business in the District of Columbia, or in Florida, or in another state.  Furthermore, none of these entities registered with the Department of Treasury (FinCEN), and none appears to have filed any reports with the Department of Treasury related to suspicious transactions or currency transactions, as is required for domestic financial institutions.

## COUNT I

31.     All statements and averments made in paragraphs 1- 30 are re-alleged and incorporated, herein, by reference.

32.     The defendant property is subject to forfeiture because it constitutes or is derived from proceeds traceable to a "specified unlawful activity."

33.     As such, the defendant property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## COUNT II

34.    All statements and averments made in paragraphs 1- 30 are re-alleged and incorporated, herein, by reference.

35.    The defendant property is subject to forfeiture because it was involved in or is traceable to property involved in a "financial transaction" as that term is defined by 18 U.S.C. § 1956(c)(4), the purpose of which was to:  (a) promote the carrying on of a "specified unlawful activity," as that term is defined by 18 U.S.C. § 1956(c)(4); and/or (b) conceal or disguise the nature, location, source, ownership or control of the proceeds of a "specified unlawful activity" as that term is defined by 18 U.S.C. § 1956(c)(7).

36.    As such, the defendant property was involved in or is traceable to property involved in money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and/or 1956(a)(1)(B)(i) and is, therefore, subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## COUNT III

37.    All statements and averments made in paragraphs 1- 30 are re-alleged and incorporated, herein, by reference.

38.    The defendant property is subject to forfeiture because it was involved in or is traceable to property involved in a conspiracy to violate the anti-money laundering statutes (as more particularly described in Count II), in violation of 18 U.S.C. § 1956(h).

39.    As such, the defendant property is, therefore, subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## COUNT IV

40.    All statements and averments made in paragraphs 1- 30 are re-alleged and incorporated, herein, by reference.

41.    In light of the above-described events, there is reason to believe that the defendant property was involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1960, and is, therefore, subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that process of warrant issue for the arrest of the defendant property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgments be entered declaring that the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

_/s/_____
JEFFREY A. TAYLOR
United States Attorney
DC Bar No. 498610

_/s/_____
WILLIAM R. COWDEN
DC Bar No. 426301
LAUREL LOOMIS RIMON
Assistant United States Attorneys
United States Attorney's Office
555 4th Street N.W.
Washington, DC 20530
(202) 514-7700
(202) 514-8707 (fax)

**<u>VERIFICATION</u>**

I, Roy Dotson, a Special Agent with the United States Secret Service, declare under

penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Complaint for Forfeiture *In*

*Rem* is based upon reports and information known to me and/or furnished to me by law

enforcement agents, and the attached Affidavit, and that everything represented herein is true and

correct to the best of my knowledge and belief.


Executed on this ___ day of July, 2007.


_/s/_____
Roy Dotson
Special Agent
United States Secret Service

-13-

## IN THE UNITED STATES  DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### AFFIDAVIT IN SUPPORT OF COMPLAINT FOR FORFEITURE
(18 U.S.C. §§ 981, 1960, 1957)

I, Roy Dotson, state as follows:

1.        I am a Special Agent ("SA") of the United States Secret Service ("USSS"), and

have been so employed for approximately three and one half  years.  I am currently assigned to

the Orlando Field Office.  Among my duties as an SA, I am charged with the investigation of

financial crimes, including check fraud, identity fraud, credit card fraud, bank and wire fraud and

the manufacturing, possession and passing of counterfeit United States currency.  Prior to my

employment with the USSS, I was employed by the Brevard County Sheriff's Office for nine

years.  My last assignment was that of a Federal Task Force Agent with the Drug Enforcement

Administration.  Among my duties as a Task Force Agent, I was charged with investigating large

criminal organizations that distributed and sold controlled substances and financial crimes

involving money laundering.  Several of the investigations resulted in the seizures of criminally

derived property, including, but not limited to, monetary instruments.

2.        An investigation into the E-GOLD operation is being conducted jointly by the

United States Secret Service, the Federal Bureau of Investigation, and the Internal Revenue

Service.  Information obtained as a result of the investigative efforts of each agency are being

shared with agents from the other agency and have been incorporated into this affidavit.  The

facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained

from other law enforcement officers; review of documents and computer records related to this

investigation; communications with others who have personal knowledge of the events and

circumstances described herein; and information gained through my training and experience and the training and experience of others.

3.      This affidavit is being submitted in support of a verified Complaint for Forfeiture *In Rem* against property seized from in the e-gold accounts listed below, all of which property was used to provide digital currency exchange services.  All of these accounts contain the digital currency "e-gold" that is allocated and transferred among accounts by e-gold, Ltd.  The physical precious metals that are "backing" the e-gold are controlled by e-gold, Ltd., Gold & Silver Reserve, Inc., Douglas L. Jackson, Barry K. Downey, and Reid Jackson, all of whom were indicted on April 24, 2007 by a federal grand jury for this district on charges of money laundering conspiracy and operation of an unlicensed money transmitting business in violation of 18 U.S.C. §§ 1956 and 1960.

| "Exchanger" | "E-GOLD" Account # |
|---|---|
| e-gold, Ltd./GSR/OmniPay | 544179 and109243 |
| AnyGoldNow and Gold to Card | 183720, 148652, and 111318 |
| The Bullion Exchange | 352900, 2325383, and 2449745 |
| Denver Gold Exchange | 3292324 |
| GitGold | 310679 |
| Gold Pouch Express | 118611 |
| uBuyWeRush | 950023 |
| IceGold | 372 and 37273 |

4.      Based upon the evidence uncovered, there is reasonable cause to believe that the property seized from the above- identified e-gold accounts was involved in a violation of Title 18, United States Code, Section 1956 and/or 1960, and is therefore subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

5.      The transactions occurring in, and the total value of, the accounts described in this Affidavit for seizure are presented below in both grams of gold and U.S. dollars to reflect the way in which the owners and operators of the e-gold system record the transactions occurring in the e-gold accounts in their databases, as discussed more fully in paragraphs 19 and 20.  To obtain the value subject to seizure from these accounts, it was necessary to require e-gold, Ltd. and/or Gold & Silver Reserve, Inc. (or another digital currency exchanger) to convert the "e-gold" in the accounts specified to United States dollars or physical precious metals before turning the funds over to the United States.

6.      This affidavit does not include every detail of every aspect of the investigation for this affidavit.  Rather, it only includes the information necessary to prove that reasonable cause exists to believe that certain property was involved in money laundering and/or the operation of an unlicensed money transmitting business in violation of Title 18, United States Code, Sections 1956 and/or 1960.

### *Background on Digital Currency Issuers and Exchangers*

7.      A "digital currency" is a medium of exchange offered over the Internet that is purportedly backed by precious metals and offers users another option for conducting on-line funds transfers.  Digital currencies are generally marketed as offering global acceptance without the need for conversion between national currencies, and are valued at fluctuating rates tied to the

price of a particular precious metal, especially gold.  Digital currency is used for on-line

commerce or for funds transfers between individuals for private purposes.  While technically

speaking, the owner of digital currency could have some right to acquire the actual metal behind

the currency, digital currency users typically convert their value into a national currency when

they want to take value out of the on-line system.

8.      One of the earliest issuers of digital currency was e-gold, Ltd. ("E-GOLD"),

which operates via the Internet using the domain name www.e-gold.com, and began offering the

digital currency "e-gold" in 1996.  E-GOLD appears as the most popular and prominent digital

currency available on-line.  e-gold is widely accepted as a payment mechanism for transactions

involving credit card and identification fraud, high yield investment programs and other

investment scams, and child exploitation.  e-gold is not widely accepted by large or mainstream

vendors.

9.      There are four primary steps involved in the transfer of funds through the e-gold

system:  (i) opening a digital currency account with E-GOLD; (ii) converting national currency

into e-gold to fund the account; (iii) using e-gold to buy or sell a good or service or transfer funds

to another person; and (iv) exchanging the e-gold back into national currency.  E-GOLD needs

two additional parties to complete these steps: (i) digital currency exchangers; and (ii) merchants

or individuals willing to accept e-gold for the payment of goods and services or to use the e-gold

operation to transfer funds.

10.      Digital currency exchangers take national currency from customers and exchange

it into e-gold for purposes of funding a new E-GOLD account, or increasing the value of an

existing account.

11.    Exchangers also exchange e-gold back into national currency and are typically the only method by which users can obtain the value out of an E-GOLD account, short of taking possession of the precious metal itself, which is not always possible and practically never done. Each exchanger set its own terms and conditions on the types and amounts of national currency that it accepts for exchange. Some only accept transfers from banks or credit card accounts. Others accept cash and money orders. Most exchangers (including all of the domestic exchangers investigated) operate out of their home by using an Internet website to service customers, bank accounts for accepting cash and other deposits, and post office boxes for receipt of checks and other mailings.

12.    The exchangers are an integral part of the e-gold operation. Some of these exchangers are sponsored by E-GOLD on its website and receive discounted rates for the e-gold they purchase to operate their businesses. While, generally, these exchangers also convert national currency to other online digital currencies, e-gold is the most prominent and extensively-used digital currency.

13.    Individuals using digital currency exchangers typically incur fees on a per transaction basis. Fees/percentages incurred per transaction depend largely on the exchanger used. In some instances, the exchanger would charge up to 6% of the amount of funds transferred. These fees assessed by the exchanger are referred to as "service fees."

14.    Users around the world can register for a free E-GOLD account via the E-GOLD website and fund their account through a third party digital currency exchanger or through E-GOLD's own exchange service, which it called "OmniPay." Once open and funded, account holders can access their accounts through the Internet and conduct transactions with other parties

anywhere in the world.  E-GOLD advertises on its website that it is "an alternative Internet payment system" that "empowers people to use gold as money."  E-GOLD advertises its service as "Better Money," and "Internet Payments 100% backed by Gold."

15.     The digital currency e-gold can be traded among online account holders using the Internet.  With only a valid e-mail address, each account holder is issued an E-GOLD account, which can be used to send and receive any amount of e-gold to/from other E-GOLD account holders anywhere in the world anonymously, instantaneously, and irreversibly.  E-GOLD, in combination with other unregistered money service businesses, has become the popular funds transfer mechanism for a multitude of criminal financial transactions.

### *The E-Gold Operation*

16.     The e-gold operation consists of two entities, e-gold, Ltd. ("E-GOLD") and Gold & Silver Reserve, Inc. ("GSR"), and three individuals, Douglas Jackson, Barry Downey, and Reid Jackson (collectively the "e-gold operation").  As described above, E-GOLD is the issuer of the digital currency known as "e-gold," which functions as an alternative payment system, is purportedly backed by stored physical gold, and operates via the Internet using the domain name www.e-gold.com.  GSR describes itself as the operator of E-GOLD and its respective website, and offers a digital currency exchange service (known as OmniPay) for individuals wishing to purchase, transfer, and/or sell e-gold.  OmniPay operates via the Internet using the domain name www.omnipay.com.  While E-GOLD was incorporated in Nevis, the e-gold operation is located entirely in Florida, including its physical business location at 175 E. Nasa Blvd., Suite 300, Melbourne, Florida (including management, employees, and records) and computer servers that conduct its on-line operations.  All e-gold transactions take place through the e-gold server and

database located in Florida.  All e-gold accounts and balances are maintained there as well.  The

e-gold operation's owners/operators include Douglas Jackson, Barry Downey, and Reid Jackson.

17.    <u>Ownership of e-gold</u>.  According to the e-gold website, the gold bullion allegedly

backing the digital currency e-gold is physically held in allocated storage in overseas vaults by

three repositories (*i.e.*, custodians) on behalf of the e-gold Bullion Reserve Special Purpose

Trust.  Also according to the e-gold website, the e-gold Bullion Reserve Special Purpose Trust

was established for holding title for the gold collectively on behalf of the e-gold account holders.

The e-gold Account User Agreement provides that an "e-metal balance is accounted by weight

and constitutes title to that precise fine weight of metal."  As such, the beneficiaries of the e-gold

Bullion Reserve Special Purpose Trust are purportedly the account holders of e-gold accounts

(collectively) and e-gold account holders purportedly hold title to the "precise fine weight of

metal" backing the amount of e-gold in their account.  However, the account holders' right to

claim the physical gold in exchange for their e-gold is severely circumscribed by the user

agreement's conditional right of redemption, which provides, among other things, that the

minimum quantity for redemption would "in no case ... be less than the fine weight of the

smallest bullion items held in storage."  According to the e-gold website, E-GOLD's lowest

ounce bar is a 32 ounce bar, worth approximately $21,248.  As a result, at a minimum, an

account holder can only exchange $21,248 worth of e-gold in order to take physical possession of

the gold.  Finally, the e-gold website also provides that "[N]o metal may be removed from

storage or any other disposition made without the signatures of both e-gold Ltd. and a third party

Escrow Agent of good reputation."  This further conditions an e-gold account holder's ability to

obtain physical possession of any gold.

*Examination of E-GOLD Customer Account Database*

18.     Search warrants were conducted on the business location of the e-gold operation as well as the location of the operation's computer servers in December of 2005.  Approximately three terabytes of digital evidence (three quadrillion characters of information) and 100 boxes of documentary evidence (approximately 288,000 pages) were seized.

19.     Evidence regarding the transactions and account activity of e-gold account holders and its customers was obtained through examination the e-gold operation's computer databases. The e-gold operation maintains Microsoft SQL server databases housing customer profiles and transaction histories of e-gold account holders, as well as OmniPay customers.  Your Affiant obtained copies of these databases by imaging servers located at AT&T in Orlando, Florida[1] and seizing back-up tapes at the Melbourne offices of the e-gold operation pursuant to a December 16, 2005 search warrant issued by a Magistrate Judge in Orlando, Florida.  The e-gold operation also provided an additional update of the database information (by copying the database to hard drives) for the period of November 2005 through October 2006 in response to subpoenas issued on May 22, 2006 and October 25, 2006.  The e-gold operation provided a second update of the database information (by copying the database to an external hard drive) for the period of October 2006 through March 2007 in response to a subpoena issued on March 6, 2007.

20.     From these images of the servers and copies of the databases, I was able to reconstruct the customer profiles and transaction histories for e-gold account holders by transferring the database information on each account holder into a Microsoft Excel spreadsheet.

---

[1] Both the e-gold and OmniPay websites and corresponding customer databases are run from servers co-located at AT&T in Orlando, Florida, approximately 100 miles from GSR's physical business location in Melbourne, Florida.

The following specific information was available for each e-gold account:

a.   Customer profile:  point of contact information for the e-gold account holder, including account name, mailing address, and email address supplied by the customer.

b.   Transaction history:  list of transactions demonstrating e-gold being transferred into and out of the account.  For each transaction, the history contains, among other things, the date of the transaction, the type of transaction (e.g., whether e-gold is being transferred into or out of the account), the e-gold account number of the other party to the transaction (also known as the "counteraccount"), the amount of the transaction, the Internet Protocol (IP) address of the transferor of e-gold, and a place for the customer to make a notation about the purpose of the transaction (also known as the "memo" field).

c.   Value limits: The e-gold operation had a policy of placing a "value-limit" on accounts that it believed to be engaged in criminal activity or where bogus contact information had been entered by the account holder.  An account holder with a "value limit" placed on his or her account was restricted from receiving any further e-gold into his or her account, although s/he continued to be free to spend or transfer any e-gold out of his or her account.  When a "value-limit" was placed on an account, a notation of the basis for the "value-limit" (such as for "child porn," "scammer," or "cc fraud") was entered in the user's account profile in the e-gold database and would appear, along with the date the value limit was placed, in the transaction history information.

21.     From these images of the servers and copies of the databases I was able to

perform various searches of the database, including, for example:

a.      Searches for particular terms used in the "memo" fields in the customer

transaction histories, such as "lolita," "IDs" or "HYIP" to indicate that "e-gold"

was being used for the purchase and sale of contraband or otherwise used for

criminal purposes.

b.      Searches for particular e-mail addresses of known criminals or criminal entities

that may have been used to create an e-gold account.

c.      Searches for particular names or nicknames of known criminals or criminal

entities that may have been used to create an e-gold account.

e.      Searches for notations of the basis for the e-gold operation placing "value-limits"

on particular accounts, such as for "child porn," "scammer," or "cc fraud".

### ***Money Transmitting Laws***

22.     Under 18 U.S.C. Section 1960, it is a felony to conduct a money transmitting

business without the appropriate state license (in a state that has a licensing requirement and

punishes such operation as a misdemeanor or felony) or federal registration, or when it otherwise

involves the transportation or transmission of funds that are known to the defendant to have been

derived from a criminal offense or intended to be used to promote unlawful activity.  The

majority of States, including Florida, and the District of Columbia require money transmitting

businesses to obtain a license and comply with the other regulatory requirements that apply to

such licensed entities, and punish the unlicensed operation of a money transmitting business as a

misdemeanor or felony.  Likewise, the federal government requires money transmitting

businesses to have registered with the Financial Crimes Enforcement Network (FinCEN), a

bureau of the Department of Treasury, by December 31, 2001 if they were in existence before

that date, and, otherwise, within 180 days after the date the business was established.

23.    The term "money transmitting" under Section 1960(b)(2) includes "transferring

funds on behalf of the public by any and all means including but not limited to transfers within

this country or to locations abroad by wire, check, draft, facsimile, or courier."

### *Digital Currency Exchangers*
### *as Unlicensed Money Transmitting Businesses*

24.    Digital currency exchangers and the e-gold operation are engaged in money

transmitting in three distinct ways: (1) funds are transferred when a customer sends money to the

exchanger for funding a new e-gold account or adding value to an existing account, whether such

transfer occurs by sending cash, money orders, or a Western Union wire, wiring funds from

his/her bank account, or providing a credit card number; (2) funds are transferred when the

digital currency exchanger sends money back to the customer in order to convert e-gold to a

national currency, whether such transfer occurs by sending cash, money orders, or a Western

Union wire, or wiring funds to the customer's bank account; and (3) funds are transferred when

e-gold is transferred from one e-gold account to another, such as when the exchanger transfers e-

gold in the exchanger's account to the customer's account for purposes of effecting the two

transactions listed above, or when a customer transfers e-gold in the customer's account to

another e-gold account holder to pay for a particular good or service or simply transmit funds as a

person-to-person payment.

25.    None of the digital currency exchangers (described below in this Affidavit) are

registered with the federal government[2] or licensed in the District of Columbia or the State in which they are physically present, as discussed more fully below.

26.    The e-gold accounts used by the digital currency exchangers (described below in this Affidavit) in their operations that I have reviewed demonstrated a large volume of deposits coming into an account, followed by a correspondingly large volume of transfers out of that account during the same time period.  I know, based on my training and experience, and based on my consultation with agents of other law enforcement agencies, that money transmitters operating in the United States typically have United States bank accounts (and in the case of digital currency exchangers, bank accounts and e-gold accounts) for which they process financial transactions involving the transferring of funds on behalf of the public by any and all means, including, but not limited to, transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.  Further, such a pattern of transactions is consistent with operation of a money transmitting business.

### *Individual Digital Currency Exchangers*

**e-gold accounts 544179 and109243
(The E-GOLD operation)**

27.    In order to conduct transactions in e-gold, it is necessary for the customer to open an e-gold account via the e-gold website.  To obtain e-gold, a customer has to exchange some amount of national currency, such as United States dollars, into e-gold through a company or individual who offers such exchange services.  As stated above, the e-gold operation offers its own exchange service in the name of OmniPay.  Third party exchangers are also a necessary part

---

[2] One exchanger, Denver Gold Exchange, recently registered with the federal government after being contacted by the USSS, as discussed more fully in paragraph 66 below.

of the e-gold operation in that they provided access to the e-gold system for the majority of e-gold users.

28.    To obtain e-gold through OmniPay, a customer is required to wire national currency, in an amount greater than $1,000, to a bank account specified by the e-gold operation. Thereafter, the customer's e-gold account would be credited for the amount of the wire, minus an exchange fee collected by OmniPay.

29.    Once a customer has obtained e-gold, the customer can transfer that e-gold to another individual or entity that has an e-gold account, to another account owned by the same customer, or to an exchanger for conversion back into United States dollars or another national currency.

30.    The e-gold operation advertises on its website at www.e-gold.com that e-gold may be used for: "e-commerce," "business-to-business payments," "point of service sales," "person-to-person payments," "payroll," "bill payments," and "charitable donations."  The e-gold operation advertises on its website at www.omnipay.comthat it offers "currency exchange services supporting the e-gold family of currencies," and that it offers a bill payment service allowing e-gold customers to convert their e-gold into a check payed to the recipient of their choice.  Through this service, a customer can place an order with OmniPay requesting to cash out his or her e-gold via check made payable to any individual or creditor specified by the customer.

31.    To provide its digital currency exchange service for the purpose of facilitating e-gold funds transfers, the e-gold operation opened and maintained several bank accounts in the name of Gold & Silver Reserve, Inc., doing business as OmniPay.

32.    The e-gold operation conducts wire transfers both into and out of their GSR bank

accounts in amounts generally totaling millions of dollars each month, both within and outside of the United States. The e-gold operation receives wire transfers into their accounts from individual customers seeking to exchange their national currency into e-gold, and from other individuals and entities who needed to buy e-gold to provide their own e-gold exchange service. The e-gold operation transfers money out of its accounts by wire for the purpose of exchanging e-gold back into national currency. The e-gold operation transfers funds between e-gold accounts to fulfill orders by their customers.

33.    The e-gold operation conducts thousands of transactions per day. For example, on November 25, 2005, the e-gold website advertised that there were 2,500,942 then-existing e-gold accounts. The website recorded the system activity in the previous 24 hours and showed the following information: 2,932 new accounts, 33,179 users accessing accounts, 38,843 e-metal spends (deposits & withdrawals) and "velocity"(*i.e.*, value circulated by spends over a given time) $6,362,572.88 USD equivalent in gold.

34.    The Florida Money Transmitter's Code, Fla. Stat. §§ 560.101-560.408, prohibits a person from engaging in the business of a money transmitter without registering with the Office of Financial Regulation. Fla. Stat. § 560.125(1). Violation of the money transmitter statute is a felony. Specifically, the penalties for violating this statute are as follows: (1) if currency or payment instruments exceed $300 but are less than $20,000 in any 12-month period, the person has committed a third degree felony; (2) if currency or payment instruments total or exceed $20,000 but are less than $100,000 in any 12-month period, the person has committed a second degree felony; and (3) if currency or payment instruments total or exceed $100,000, the person has committed a first degree felony. Fla. Stat. § 560.125(5)(a)-(c).

35.     Under Florida Money Transmitters' Code, the term "money transmitter" includes any person located in or doing business in Florida who acts as a payment instrument seller, foreign currency exchanger, check casher, funds transmitter, or deferred presentment provider." Fla. Stat. § 560.103(11).  The term "funds transmitter" includes "any person who engages in the receipt of currency or payment instruments for the purpose of transmission by any means, including transmissions within this country or to or from locations outside this country, by wire, facsimile, electronic transfer, courier, or otherwise."  Fla. Stat. § 560.103(10).

36.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq., prohibits a person from engaging in the business of money transmission without obtaining a license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat. § 26-1023.

37.     Under the D.C. Money Transmitters Act, the term "money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer."  D.C. Stat. § 26-1001(10).

38.     I accessed the State of Florida's online search function for money transmitters located at http://www.flofr.com/licensing/download.htm and entered a search for E-GOLD, Gold & Silver Reserve, Inc., and OmniPay, which indicated that the e-gold operation is not licensed in Florida.  I accessed the District of Columbia's online search function for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for E-GOLD, Gold & Silver

Reserve, Inc., and OmniPay, which indicated that the e-gold operation is not licensed in the District of Columbia. A list of the money transmitters registered with the Department of Treasury (FinCEN) can be found at the internet website http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that the e-gold operation is not registered with FinCEN. Additionally, the e-gold operation has not filed any reports with the Department of Treasury related to suspicious transactions or currency transactions, as is required for money services businesses.

39.     On or about the dates listed in the chart below, the following wire transfers from OmniPay customers to GSR (for purposes of funding e-gold accounts) and from GSR to OmniPay customers (for purposes of exchanging e-gold into national currency) occurred to and from banks located in the District of Columbia:

| Date | Amount | From | To |
|------|--------|------|-----|
| 5/14/2002 | $1,000.00 | Account no. 17215286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. 005483527192 at Bank of America |
| 5/28/2002 | $1,000.00 | Account no. 17215286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. 005483527192 at Bank of America |
| 6/27/2002 | $1,000.00 | Account no. 17215286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. 2000014277487 at First Union National Bank |
| 10/24/2002 | $70.00 | Gold & Silver Reserve, Inc. Account no. 2000014277487 at First Union National Bank | Account no. 254074345 at Wright Patman Congressional Federal Credit Union |
| 11/15/2002 | $1,500.00 | Account no. 17215286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. 2000014277487 at First Union National Bank |

| 11/20/2002 | $195.00 | Gold & Silver Reserve, Inc. Account no. 2000014277487 at Wachovia Bank | Account no. 254074345 at Wright Patman Congressional Federal Credit Union |
| 3/24/2003 | $1,500.00 | Account no. 17215286 at Riggs National Bank | Gold & Silver Reserve, Inc. Account no. 2000014277487 at Wachovia Bank |

40.    The e gold operation has been utilizing e-gold account numbers 544179

(in the name of C1 By HF/e gold Ltd.) since May 10, 2002, and 109243 (in the name of

GSR/OmniPay) since November 8, 1999, for its operations.  Analysis of activity occurring in e-

gold account number 544179 from May 2002 through March 2007 yielded the following results:

There were 1,080 transactions with a total value of 57825.359949 grams ($17,590,484.65),

comprised of 790 transactions into the e gold account valued at 30288.893383 grams

($8,178,345.15), and 290 transactions out of the account valued at 27536.465660 grams

($8,869,880.37).  As of March 2007, approximately 1729.83928 grams of gold and 2996.63542

grams of silver (totaling $1,180,022.29) remained in e gold account number 544179.

41.    Analysis of activity occurring in e gold account number 109243 from November

1999 through March 2007 yielded the following results: There were transactions with a total

value of 2492053.53643 grams ($370,165,764.60), comprised of 46,163 transactions into the e

gold account valued at 1233751.63975 grams ($238,064,379.30), and 5,703 transactions out of

the account valued at 1258301.89668 grams ($132,101,385.30).  As of March 2007,

approximately 1324.235454 grams of gold, 28157.1133 grams of silver, and 228.70542 grams of

platinum (totaling $1,529,111.14) remained in e gold account number 109243.

**e-gold accounts 183720, 148652, and 111318**
**(AnyGoldNow and Gold to Card)**

42.     "AnyGoldNow" is a digital currency exchanger operating via the Internet at www.anygoldnow.com, and is operated by Patrick Verbeeck at his home in California. AnyGoldNow has a registered fictitious name in California that was registered in 2002, although its e-gold account was in operation since October 2000.  Exchange activity appears to have begun in December 2001.

43.     AnyGoldNow advertises on its website that it has been one of the "leading Exchange providers since 2001," and offers to exchange national currency for a number of digital currencies, including e-gold, at various exchange fees depending on the type of digital currency involved.  AnyGoldNow accepts national currency via domestic or international bank wire, or electronic bank payment, for conversion and transfer into the e-gold system.  AnyGoldNow also accepts e-gold for conversion back into national currency, and will send that currency to its customers via domestic or international wire, or by check drawn on its domestic bank.

44.     Pursuant to section 1800.3 of the California Financial Code, a person may not engage in the business of "receiving money for the purpose of transmitting the same or its equivalent to foreign countries" without first obtaining a license from the Commissioner of Financial Institutions.  A "Directory of Transmitters of Money Abroad" licensed by the State of California can be found at the Internet website http://www.dfi.ca.gov/directry/tma.asp, and reflects the fact that AnyGoldNow is not licensed in California.

45.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq., prohibits a person from engaging in the business of money transmission without obtaining a

license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter

statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat.

§ 26-1023.  Under the D.C. Money Transmitters Act, the term "money transmission" is defined

as "the sale or issuance of payment instruments or engaging in the business of receiving money

for transmission or transmitting money within the United States, or to locations abroad, by any

and all means, including but not limited to payment instrument, wire, facsimile, or electronic

transfer."  D.C. Stat. § 26-1001(10).  I accessed the District of Columbia's online search function

for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for

AnyGoldNow, which indicated that AnyGoldNow is not licensed in the District of Columbia.

46.    A list of the money transmitters registered with the Department of Treasury

(FinCEN) can be found at the internet website

http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that AnyGoldNow is

not registered with FinCEN.  Additionally, AnyGoldNow has not filed any reports with the

Department of Treasury related to suspicious transactions or currency transactions, as is required

for money services businesses.

47.    On March 4, 2007, your affiant oversaw the opening by other agents of e-gold

account number 4170759, using e-mail address samskyw@gmail.com.   On the same day, I

oversaw the placement by other agents of an order via the www.anygoldnow.com website

requesting to convert $100 national currency into e-gold, and received an automated e-mail

response asking me to fax or electronically upload them a copy of a photo I.D. and a copy of a

phone bill.  On March 5, 2007 a USSS SA acting in an undercover capacity opened account

number 1010161580209 at Wachovia Bank located at 1150 K St., N.W., Washington, D.C.  On

March 12, 2007, I electronically sent the required identification documents to AnyGoldNow.

48.    On March 13, 2007, I received wiring instructions by e-mail informing me to wire my funds ($116.59, including a $16 transaction fee, and .59 to reflect the last 2 numbers of my e-gold account to facilitate identification of the transfer) to account number 3081984524 at Washington Mutual bank in California, and to indicate the order instructions on the wiring instructions.  On March 15, 2007, I initiated a wire transfer of $116.59 from the undercover Wachovia Account to AnyGoldNow's Washington Mutual Account.  On March 16, 2007, my undercover e-gold account reflected an incoming transfer from AnyGoldNow's e-gold account number 183720 in the name of "AnyGoldNow."

49.    Analysis of e-gold account number183720 yielded the following results: An approximate total of 15,320 transactions occurred, including 6,378 transactions into the account valued at 61363.22044 grams ($27,085,634.32), and 8,942 transactions out of the account valued at 59916.89565grams ($27,047,227.46).  As of March16, 2007, approximately 137.663201 grams of gold and 1282.64305 grams of silver (totaling $104,816.35) remained in e-gold account number 183720.

50.    A search in the e-gold database for Patrick Verbeeck, the operator of AnyGoldNow, revealed that he has used several e-gold accounts to operate AnyGoldNow and other similar businesses.  A second account that AnyGoldNow uses in its operation is e-gold account number 148652 in the name of AGN Hold Fraud Investigations.  By its name, this second account appears to contains funds that will be held temporarily by AnyGoldNow if it is concerned that the funds are related to fraudulent transactions or activity.  On June 29, 2006, 695.504665 grams ($410,000) was transferred from e-gold account number 183720

(AnyGoldNow's primary e-gold account in the name of Any Gold Now Main AGN Account) to e-gold account number 148652 in the name of AGN Hold Fraud Investigations. The 725.278613 grams ($410,000) was originally transferred into AnyGoldNow account number 183720 from the owner of e-gold account number 2879281, Georgi Lukanov, whose listed address is in Bulgaria, for purposes of exchange into national currency. Instead of completing the transaction, AnyGoldNow transferred the funds into its "Hold Fraud Investigations" account, most likely because it suspected Mr. Lukanov of being involved in fraudulent activity. After this transfer, Mr. Lukanov transferred approximately 8.558713 grams ($5,000) worth of e-gold from his e-gold account to the e-gold account of Michael Bruzzese with a reference in the "memo" field of "Georgi Lukanov v Anygoldnow.com our case". Michael Bruzzese is an attorney, who maintains the website www.lawyers.com/bruzzeselaw and is known to represent e-gold customers in disputes involving HYIPs and other investment scams. As of March 2007, approximately 690.842542 grams ($442,070.14) remained in e-gold account number 148652.

51. Patrick Verbeek also operates e-gold account number 111318 for a separate but related business called "Gold to Card." Gold to Card operates via the Internet website www.goldtocard.com and offers a reloadable debit card as a way to exchange out e-gold into national currency. It advertises on its website "cash out your Gold anywhere you go!". The debit cards were issued by North York Community Credit Union and do not have the customer's name printed on the cards. On February 9, 2007, Gold to Card announced on its website that it was discontinuing its debit card program for various compliance issues.

52. An analysis of Gold to Card's e-gold account number 111318 yielded the following results: Patrick Verbeek began operating the account on December 31, 1999. From

December 1999 through March 2007 it conducted 10,630 e-gold transactions, with a total value

of 43864.24359 grams ($21,153,789), comprised of 9,912 transactions into the account valued at

23688.79515 grams ($10,665,070), and 718 transactions out of the account valued at

20175.44844 grams ($10,488,719).  After February 2007 there were only three transactions out

of the account, and no further transactions into the account: one transfer for 45.160319 grams

($30,000) was made on February 13, 2007 to the AnyGoldNow primary account (e gold account

number 183720); two transfers were made on February 25, 2007 and February 26, 2007 totaling

approximately 43.973257 grams ($30,061) to e gold account number 909090 in the name of Gold

X Gold Debit Cards controlled by Marco Lavana.  As of March 2007, approximately 137.663201

grams of gold and 1282.64305 of silver (totaling $157,757) remained in e gold account number

111318.

### e-gold accounts 352900, 2325383, and 2449745
### (The Bullion Exchange)

53.    "The Bullion Exchange" is a corporation incorporated in Utah and located in Salt

Lake City, at the home address of the operators of the corporation – Carole and Don Neve.  The

Bullion Exchange advertises itself as a "Discount Exchange Provider of online digital money and

Precious Metals," that offers to buy or sell e-gold (and "e-bullion," another form of online digital

currency) for various exchange fees depending on the type of transaction.  The Bullion Exchange

accepts funds for transfer into the e-gold system in the form of direct cash deposit or wire

transfer into its Wells Fargo Bank account, or by cashier's check or money order.

54.    Pursuant to section 7-1-501 of the Code of Utah, a person engaged in the business

of "allowing persons to effect third party payments from loan, charge, or other accounts by

checks, drafts, or other instruments or by electronic means," is subject to the jurisdiction of the

Utah Department of Financial Institutions and is required to be licensed. A list of the money transmitters licensed by the State of Utah can be found at the internet website http://www.dfi.utah.gov/MonTrans.htm, and reflects the fact that The Bullion Exchange is not licensed in Utah.

55.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq., prohibits a person from engaging in the business of money transmission without obtaining a license from the Superintendent. D.C. Stat. § 26-1002. Violation of the money transmitter statute is a felony with penalties of up to a $25,000 fine and five years imprisonment. D.C. Stat. § 26-1023. Under the D.C. Money Transmitters Act, the term "money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer." D.C. Stat. § 26-1001(10). I accessed the District of Columbia's online search function for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for The Bullion Exchange, which indicated that The Bullion Exchange is not licensed in the District of Columbia.

56.     A list of the money transmitters registered with the Department of Treasury (FinCEN) can be found at the internet website http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that The Bullion Exchange is not registered with FinCEN. Additionally, The Bullion Exchange has not filed any reports with the Department of Treasury related to suspicious transactions or currency transactions, as is required for money services businesses.

57.     On March 4, 2007, your affiant oversaw the opening by other agents of e-gold account number 4170875, using the e-mail address of shadesofgreyster@gmail.com.  On the same day, I placed an order requesting to exchange $100 into e-gold via wire transfer, and received instructions to send $118 ($18 being the transaction fee) to a specified bank account. On March 5, 2007, another USSS SA, acting in an undercover capacity, opened account number 1010166201253 at Wachovia Bank located at 1301 Pennsylvania Ave., Washington, D.C. for the purpose of funding this account.  On March 6, 2007, the undercover agent initiated a wire transfer of $118 to account number 5712335693 belonging to The Bullion Exchange at Wells Fargo Bank.  On March 7, 2007, I received a message on an undercover cellular phone voice mail account from a representative of The Bullion Exchange.  When the undercover agent returned the call, The Bullion Exchange representative requested that a copy of a photo I.D., a phone bill matching the phone number used for the order, and a utility bill matching the D.C. address being used in the order be faxed to 801-486-0777 prior to processing the transaction.  A copy of an undercover Florida driver's license, along with fictitious phone and utility bills, were faxed to The Bullion Exchange on March 8, 2007.  On March 9, 2007, "The Bullion Exchange 2" e-gold account 2325383 transferred $100 worth of e-gold (.153657 troy oz.) to the undercover e-gold account number 4170875.

58.     The Bullion Exchange has two e-gold accounts, which are used to facilitate its digital currency exchange business by holding the e-gold that The Bullion Exchange is selling to and buying from its customers.

59.     An analysis of The Bullion Exchange's primary e-gold account, number 352900, yielded the following results:  The Bullion Exchange began operating the account on August 6,

2001. From August 2001 through October, 2006 it conducted 69,821 e-gold transactions, with a total value of 370331.7551 grams ($178,867,744.10). This total was comprised of 26,728 deposits of funds into the account, with a total value of 170281.2557 grams $($88,323,607.08), and 43,093 transactions out of the account valued at 200050.4994 grams ($88,349,820.55). As of March 2007, approximately 216.811258 grams ($138,737.52) remained in e-gold account number 352900.

      60.     An analysis of account number 2325383 in the name of "Bullion Exchange 2" - the account that funded our undercover exchange - yielded the following results: The account began operating on August 2005. From August 2005 through October 2006, The Bullion Exchange conducted 6,509 transactions with a total weight of 81669.0983 grams ($38,840,867), comprised of 388 transactions of funds into the account valued at 40834.95901 grams ($19,421,738), and 6,121 transactions out of the account valued at 40834.13929 grams ($19,419,129). e-gold account number 2325383 appears to serve as the primary e-gold account used by The Bullion Exchange to fund e-gold transfers for customers purchasing e-gold by bank wire or direct cash deposit as opposed to other forms of payment. When additional e-gold is needed to fulfill customer requests, The Bullion Exchange transfers funds into this account from its main operating account (e-gold account 352900). As of March 2007, approximately $0 remains in e-gold account number 2325383. Although the balance in March was zero, historically the balance of this account has fluctuated greatly, and as a result, it is possible that the actual amount in the account at the time of seizure will be significantly greater.

      61.     An analysis of e-gold account number 2449745 in the name of "Bullion Exchange III" yielded the following results: The account began operating in September 2005, and from

September 2005 through October 2006, 9,853 transactions occurred, with a total value of 22142.99647 grams ($9,664,529).  Of these transactions, there were 273 transactions of funds received into the account valued at 11071.9944 grams ($4,832,454), and 9,580 transactions of funds transferred out of the account valued at 11071.002 grams ($4,832,075).  E-gold account number 2449745 appears to be the account used by The Bullion Exchange for customers funding their exchanges through money orders and cashier's checks, as opposed to cash or wire.  The Bullion Exchange makes transfers from their main operating account (e-gold account number 352900) as needed to cover spends.  As of March 2007, approximately $0 remained in e-gold account number 2449745.  Although the balance in March 2007 is zero, historically the balance of this account has fluctuated greatly, and as a result, it is possible that the actual amount in the account at the time of seizure will be significantly greater.

### e-gold account 3292324
### (Denver Gold Exchange)

62.    "Denver Gold Exchange" is a Colorado corporation operating via Internet website www.denvergoldexchange.com that was registered with the Colorado Secretary of State on July 24, 2006, and lists as its address as being in Denver, Colorado 80222.  This address is a retail mailing and business service center.  The owner of Denver Gold Exchange is David S. Metzel, who has previously identified himself as such to USSS agents.  Denver Gold Exchange advertises itself as a "Digital Currency Exchanger" offering "lots of payment options" and "worldwide funding," and to buy or sell e-gold (and "e-bullion," another form of online digital currency) for various exchange fees depending on the type of transaction.  Denver Gold Exchange accepts funds for transfer into the e-gold system in the form of "Direct Cash Deposits

at (Bank of America, Chase, Washington Mutual and Wells Fargo), Bank Wires, Money Orders,

Moneygram Express and American Express."

63.     Pursuant to section 12-52-104 of the Colorado Statutes, a person engaged in the

business of "selling or issuing exchange or in the business of money transmission," must first

obtain a license from the Colorado Banking Board.  Section 12-52-103 defines "money

transmission" as meaning "the sale or issuance of exchange or engaging in the business of

receiving money for transmission or transmitting money within the United States or to locations

abroad by any and all means including but not limited to payment instrument, wire, facsimile, or

electronic transfer."  Further, "exchange" means any check, draft, money order, or other

instrument for the transmission or payment of money or credit.  It does not mean money or

currency of any nation."  I accessed the State of Colorado's online search function for money

transmitters located at http://www.dora.state.co.us/pls/real/bidS_Search.Search_Page, and

entered a search for Denver Gold Exchange, which indicated that Denver Gold Exchange is not

licensed in Colorado.

64.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq.,

prohibits a person from engaging in the business of money transmission without obtaining a

license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter

statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat.

§ 26-1023.  Under the D.C. Money Transmitters Act, the term "money transmission" is defined

as "the sale or issuance of payment instruments or engaging in the business of receiving money

for transmission or transmitting money within the United States, or to locations abroad, by any

and all means, including but not limited to payment instrument, wire, facsimile, or electronic

transfer." D.C. Stat. § 26-1001(10).  I accessed the District of Columbia's online search function

for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for

Denver Gold Exchange, which indicated that Denver Gold Exchange is not licensed in the

District of Columbia.

      65.    A list of the money transmitters registered with the Department of Treasury

(FinCEN) can be found at the internet website

http://www.msb.gov/guidance/msbstateselector.php, and, at the time I searched the website in

early March 2007, reflected the fact that Denver Gold Exchange was not registered with FinCEN.

However, the investigation has revealed that Denver Gold Exchange has registered with FinCEN

as of March 7, 2007, most likely as a result of contact between David Metzel and the USSS in

late February 2007 in regards to Denver Gold Exchange's activities.  Additionally, Denver Gold

Exchange has not filed any reports with the Department of Treasury related to suspicious

transactions or currency transactions, as is required for money services businesses.

      66.    On March 4, 2007, your affiant opened e-gold account number 4170812, using the

e-mail address of qwerty9ster@gmail.com.  On the same day, I registered with Denver Gold

Exchange and placed an order requesting to exchange $100 into e-gold via direct cash deposit.

On March 5, 2007, an undercover agent working with me made a direct deposit at Bank of

America located at 1501 Pennsylvania Ave., N.W., Washington, D.C. 20006 of $114 ($14

exchange fee) into account number 229001880864 in the name of Used Media, LLC. for the

purpose of funding the undercover e-gold account.  On March 9, 2007, as requested by Denver

Gold Exchange, I faxed a copy of the bank deposit receipt notated with my exchange order

number to (303) 379-4256.  On that same date, I received $100 worth of e-gold transferred into

my undercover e-gold account from Denver Gold Exchange's e-gold account number 3292324.

67.     Denver Gold Exchange has been utilizing e gold account number 3292324 for its operations since June 2006.  Analysis of activity occurring in this account from June 2006 through March 2007 yielded the following results: There were 2953 transactions with a total weight of 6286.879491 grams ($3,975,249.60), comprised of 457 transactions into the e gold account with a weight of 3195.823731 grams ($2,021,936), and 2496 transactions out of the account with a weight of 3091.05576 grams ($1,953,312).  As of March 2007, approximately 103.770199 grams ($68,395) remained in e gold account number 3292324.

**e-gold account 310679**
**(GitGold)**

68.     "GitGold" is a digital currency exchanger operating via Internet website www.gitgold.com, and lists as its corporate name and address GitGold Worldwide Inc., in Melbourne, Florida.  The address it lists corresponds to a retail mailing and business service center.  GitGold advertises that it is "The fastest way to turn dollars into gold" and offers to exchange national currency for a number of digital currencies, including e-gold.  The owners and operators of GitGold are Jane Anderson, the president and sole shareholder, and David Anderson, the treasurer.  The Andersons created their digital currency exchanger business in response to a solicitation from Douglas Jackson in the early stages of e-gold's development.  The Andersons also own and operate a mail service business, Stop N Mail, from the address listed above.  GitGold accepts funds for transfer into the e-gold system in the form of bank wires, money orders, and cashiers checks.

69.     According to the GitGold website, money orders (in contrast to bank wires) allow

for anonymous transactions:

> "Note - you can send a money order using an overnight service that will cost less than sending a wire, have it funded in the same time frame (evening of the next business day) and we won't have to confirm your identity first."

70.     The Florida Money Transmitter's Code, Fla. Stat. §§ 560.101-560.408, prohibits a person from engaging in the business of a money transmitter without registering with the Office of Financial Regulation.  Fla. Stat. § 560.125(1).  Violation of the money transmitter statute is a felony.  Specifically, the penalties for violating this statute are as follows: (1) if currency or payment instruments exceed $300 but are less than $20,000 in any 12-month period, the person has committed a third degree felony; (2) if currency or payment instruments total or exceed $20,000 but are less than $100,000 in any 12-month period, the person has committed a second degree felony; and (3) if currency or payment instruments total or exceed $100,000, the person has committed a first degree felony.  Fla. Stat. § 560.125(5)(a)-(c).

71.     Under Florida Money Transmitters' Code, the term "money transmitter" includes any person located in or doing business in Florida who acts as a payment instrument seller, foreign currency exchanger, check casher, funds transmitter, or deferred presentment provider." Fla. Stat. § 560.103(11).  The term "funds transmitter" includes "any person who engages in the receipt of currency or payment instruments for the purpose of transmission by any means, including transmissions within this country or to or from locations outside this country, by wire, facsimile, electronic transfer, courier, or otherwise."  Fla. Stat. § 560.103(10).

72.     I accessed the State of Florida's online search function for money transmitters located at http://www.flofr.com/licensing/download.htm and entered a search for GitGold Worldwide Inc, which indicated that GitGold is not licensed in Florida.

73.    The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq.,
prohibits a person from engaging in the business of money transmission without obtaining a
license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter
statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat.
§ 26-1023.  Under the D.C. Money Transmitters Act, the term "money transmission" is defined
as "the sale or issuance of payment instruments or engaging in the business of receiving money
for transmission or transmitting money within the United States, or to locations abroad, by any
and all means, including but not limited to payment instrument, wire, facsimile, or electronic
transfer."  D.C. Stat. § 26-1001(10).  I accessed the District of Columbia's online search function
for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for
GitGold, which indicated that GitGold is not licensed in the District of Columbia.

74.    A list of the money transmitters registered with the Department of Treasury
(FinCEN) can be found at the internet website
http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that GitGold is not
registered with FinCEN.  Additionally, GitGold has not filed any reports with the Department of
Treasury related to suspicious transactions or currency transactions, as is required for money
services businesses.

75.    On March 4, 2007, your affiant opened e-gold account number 4170234, using the
e-mail address of jawalover@gmail.com.  In accordance with instructions on the GitGold website
for accepting money orders, on March 5, 2007 I purchased a money order for $100 from the post
office branch located at 1400 L Street NW, Washington DC, and sent this money order overnight
from the District of Columbia to Gitgold Worldwide, Inc. in Melbourne, FL, referencing e-gold

account number 4170234.  The money order was delivered on March 6, 2007 at 12:39 p.m., and

signed for by J Anderson.  On March 7, 2007 I received $90 ($100 minus the $10 fee collected

by GitGold) worth of e-gold transferred into my undercover e-gold account number 4170234

from Gitgold's e-gold account number 310679.

76.    GitGold has been utilizing e gold account number 310679 for its operations since

May 2001.  Analysis of activity occurring in this account from May 2001 through March 2007

yielded the following results: There were 31,064 transactions with a total weight of 62796.00473

grams ($24,065,399), comprised of 5,140 transactions into the e gold account with a weight of

31432.38649 grams ($12,047,797), and 25,924 transactions out of the account with a weight of

31363.61824 grams ($12,017,602).  As of March 2007, approximately 54.636427 grams

($36,002) remained in e gold account number 310679.

### e-gold account 118611
### (Gold Pouch Express)

77.    "Gold Pouch Express" is a digital currency exchanger that operates via the

Internet website www.goldpouchexpress.com. It advertises itself as an "Exchange Service

Provider" and offers to purchase, sell, or trade e-gold and other digital currencies. The owners

and operates of Gold Pouch Express are Roger and Mimi Savoie, who operate the business from

their home residence (a trailer in a park for recreational vehicles) in Arcadia, Florida.  This

address is listed on the website as their business address.  Gold Pouch Express accepts funds for

transfer into the e-gold system in the form of money order, bank wire, Interac e-mail money

transfer, internet/telephone banking, and credit card.  Gold Pouch Express also accepts e-gold for

conversion back into national currency, and will send that currency to its customers via company

check, cashier's check, Interac e-mail money transfer, bank wire, or Royal Bank transfer. They maintain banking relationships with The Royal Bank of Canada to facilitate their funds transfer activities.

78.    The Florida Money Transmitter's Code, Fla. Stat. §§ 560.101-560.408, prohibits a person from engaging in the business of a money transmitter without registering with the Office of Financial Regulation. Fla. Stat. § 560.125(1). Violation of the money transmitter statute is a felony. Specifically, the penalties for violating this statute are as follows: (1) if currency or payment instruments exceed $300 but are less than $20,000 in any 12-month period, the person has committed a third degree felony; (2) if currency or payment instruments total or exceed $20,000 but are less than $100,000 in any 12-month period, the person has committed a second degree felony; and (3) if currency or payment instruments total or exceed $100,000, the person has committed a first degree felony. Fla. Stat. § 560.125(5)(a)-(c).

79.    Under Florida Money Transmitters' Code, the term "money transmitter" includes any person located in or doing business in Florida who acts as a payment instrument seller, foreign currency exchanger, check casher, funds transmitter, or deferred presentment provider." Fla. Stat. § 560.103(11). The term "funds transmitter" includes "any person who engages in the receipt of currency or payment instruments for the purpose of transmission by any means, including transmissions within this country or to or from locations outside this country, by wire, facsimile, electronic transfer, courier, or otherwise." Fla. Stat. § 560.103(10).

80.    I accessed the State of Florida's online search function for money transmitters located at http://www.flofr.com/licensing/download.htm and entered a search for Gold Pouch Express, which indicated that Gold Pouch Express is not licensed in Florida.

81.     The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq.,
prohibits a person from engaging in the business of money transmission without obtaining a
license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter
statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat.
§ 26-1023.  Under the D.C. Money Transmitters Act, the term "money transmission" is defined
as "the sale or issuance of payment instruments or engaging in the business of receiving money
for transmission or transmitting money within the United States, or to locations abroad, by any
and all means, including but not limited to payment instrument, wire, facsimile, or electronic
transfer."  D.C. Stat. § 26-1001(10).  I accessed the District of Columbia's online search function
for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for
Gold Pouch Express, which indicated that Gold Pouch Express is not licensed in the District of
Columbia.

82.     A list of the money transmitters registered with the Department of Treasury
(FinCEN) can be found at the internet website
http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that Gold Pouch
Express is not registered with FinCEN.  Additionally, Gold Pouch Express has not filed any
reports with the Department of Treasury related to suspicious transactions or currency
transactions, as is required for money services businesses.

83.     On March 4, 2007, your affiant opened e-gold account number 4170537, using the
e-mail address of r2d2lover@gmail.com.  In accordance with instructions on the Gold Pouch
Express website for accepting money orders, on March 5, 2007, I purchased a money order for
$110 from the post office branch located at 1400 L Street NW, Washington DC, and sent this

money order overnight from the District of Columbia to Gold Pouch Express, in Arcadia,

Florida, referencing e-gold account number 4170537.  The money order was delivered on March

8, 2007 at 12:36 p.m., and signed for by R. Savier.  On March 26, 2007, I received $100 ($110

minus the $10 fee collected by Gold Pouch Express) worth of e-gold transferred into my

undercover e-gold account number 4170537 from Gold Pouch Express' e-gold account number

118611.

84.    Gold Pouch Express has been utilizing e gold account number 118611 for its

operations since February 2000.  Analysis of activity occurring in e gold account number 118611

from February 2000 through March 2007 yielded the following results: There were 26,911

transactions with a total weight of 59407.663122 grams ($23,078,896), comprised of 3116

transactions into the account with a weight of 30430.82988 ($11,551,513) and 23,795

transactions out of the account with a weight of 28976.833242 grams ($11,527,383).  As of

March 2007, approximately 31.198899 grams of gold ($20,563) remained in e gold account

number 118611.

### e-gold account 950023
### (uBuyWeRush)

85.    "uBuyWeRush" is a digital currency exchanger operating via Internet website

www.ubuywerush.com, and lists as its corporate name and address uBuyWeRush, Inc., in Long

Beach, CA, to an address that is adjacent to uBuyWeRush's actual store-front location at 3327 E

South Street, Long Beach, CA 90805.  The operator of uBuyWeRush is Cesar Carranza.

uBuyWeRush advertises that it is an "E-Gold Exchanger" and that "We Buy E-Gold" and "We

Ship Worldwide."  Cesar Carranza has advertised his services as an exchanger for e-gold to the

carding community, including on the website Carderplanet, which is dedicated to the purchase

and sale of stolen financial information.  uBuyWeRush charges a 6% transaction fee for the

purchase of e-gold, which is 300% higher than other digital currency exchangers.  uBuyWeRush

utilizes other exchangers that charge a lower transaction fee to facilitate transactions on behalf of

its customers.  uBuyWeRush accepts funds for transfer into the e-gold system in the form of

Money Gram, Western Union, cash deposits, bank wire, and money orders.  It recently

discontinued accepting credit card payments.  uBuyWeRush also accepts e-gold for conversion

back into national currency, and will send that currency to its customers worldwide in the form of

Western Union, Money Gram, PayPal, cash deposit, money orders, AlertPay, COD, company

check, or merchandise trade.  The company utilizes Bank of America account number xxxxx-

x9545 in the name of uBuyWeRush to receive cash deposits and interbank wires.

     86.    Pursuant to section 1800.3 of the California Financial Code, a person may not

engage in the business of "receiving money for the purpose of transmitting the same or its

equivalent to foreign countries" without first obtaining a license from the Commissioner of

Financial Institutions.  A "Directory of Transmitters of Money Abroad" licensed by the State of

California can be found at the Internet website http://www.dfi.ca.gov/directry/tma.asp, and

reflects the fact that uBuyWeRush is not licensed in California.

     87.    The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq.,

prohibits a person from engaging in the business of money transmission without obtaining a

license from the Superintendent.  D.C. Stat. § 26-1002.  Violation of the money transmitter

statute is a felony with penalties of up to a $25,000 fine and five years imprisonment.  D.C. Stat.

§ 26-1023.  Under the D.C. Money Transmitters Act, the term "money transmission" is defined

as "the sale or issuance of payment instruments or engaging in the business of receiving money

for transmission or transmitting money within the United States, or to locations abroad, by any

and all means, including but not limited to payment instrument, wire, facsimile, or electronic

transfer." D.C. Stat. § 26-1001(10). I accessed the District of Columbia's online search function

for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for

uBuyWeRush, which indicated that uBuyWeRush is not licensed in the District of Columbia.

88.    A list of the money transmitters registered with the Department of Treasury

(FinCEN) can be found at the internet website

http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that uBuyWeRush is

not registered with FinCEN. Additionally, uBuyWeRush has not filed any reports with the

Department of Treasury related to suspicious transactions or currency transactions, as is required

for money services businesses.

89.    On March 4, 2007, your affiant opened e-gold account number 4170895, using the

e-mail address of asdfgh99ster@gmail.com. In accordance with instructions on the

uBuyWeRush website for making cash deposits, on March 5, 2007 a Secret Service special agent

at my direction made a deposit at a Bank of America branch in the District of Columbia for

$100.95 to Bank of America account number xxxxx-x9545 in the name of uBuyWeRush. On

March 12, 2007, I received $100 worth of e-gold into my undercover e-gold account number

4170895 from e-gold account 2102119, a second account through which uBuyWeRush makes

transfers.

90.    uBuyWeRush has been utilizing e gold account number 950023 for its operations

since August 2003. Analysis of activity occurring in e gold account number 950023 from August

2003 through March 2007 yielded the following results: A large percentage of the transactions appear to be transactions with other exchange providers. Another large percentage of the transactions appear to be transactions with carders (i.e., individuals known to be engaged in credit card fraud and identity theft). There were 2,078 transactions with a total weight of 7291.495578 grams ($4,054,419), comprised of 543 transactions into the account with a weight of 3646.278503 grams ($2,025,387) and 1,535 transactions out of the account with a weight of 3645.217075 grams ($2,029,032). As of March 2007, approximately .011213 grams ($7.39) remained in e gold account number 950023. Although the balance in March 2007 is a small amount, historically the balance of this account has fluctuated greatly, and as a result, it is possible that the actual amount in the account at the time of seizure will be significantly greater.

### e-gold accounts 372 and 37273
### (IceGold)

91.    "IceGold" is a digital currency exchanger that operates via the Internet website www.icegold.com. The Icegold website advertises that it is an international e-currency exchange with customers in 142 countries and jurisdictions worldwide and that its customers can "buy e-gold or 1mdc with a bank wire" or "sell e-gold or 1mdc for a bank wire". The website also indicates that IceGold is owned by Estonian and United States individuals and companies. Douglas Jackson and Barry Downey provided IceGold with an initial investment in exchange for a 25% ownership in the business. Jackson and Downey continue to be 25% shareholders in IceGold. IceGold is allegedly operated by Paul Vahur in Tallinn, Estonia and lists on its website a corporate address in Estonia. Nonetheless, the IceGold website is in English and solicits customers in the United States (e.g., information, including exchange rates and sending bank

wires, references U.S. dollars). Indeed, as discussed more fully below, a significant percentage of IceGold's customers are e-gold account holders from the United States. IceGold accepts funds for transfer into and out of the e-gold system via bank wire.

92.    A list of the money transmitters registered with the Department of Treasury (FinCEN) can be found at the internet website http://www.msb.gov/guidance/msbstateselector.php, and reflects the fact that IceGold is not registered with FinCEN. Additionally, IceGold has not filed any reports with the Department of Treasury related to suspicious transactions or currency transactions, as is required for money services businesses.

93.    The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq., prohibits a person from engaging in the business of money transmission without obtaining a license from the Superintendent. D.C. Stat. § 26-1002. Violation of the money transmitter statute is a felony with penalties of up to a $25,000 fine and five years imprisonment. D.C. Stat. § 26-1023. Under the D.C. Money Transmitters Act, the term "money transmission" is defined as "the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer." D.C. Stat. § 26-1001(10). I accessed the District of Columbia's online search function for money transmitters located at http://app.dbfi.dc.gov/ifs/default.asp and entered a search for IceGold, which indicated that IceGold is not licensed in the District of Columbia.

94.    On March 4, 2007, your affiant opened e-gold account number 4170999, using the e-mail address of prinleia@gmail.com. On the same date, I opened an account with IceGold,

number 12300400.  In accordance with instructions on the IceGold website for sending

international wires, on March 15, 2007, I sent a wire from an undercover Wachovia bank account

(from a Wachovia bank branch at 1100 Connecticut Avenue, NW, Washington DC) for $100 to

Sampo Pank AS account number xxxxxxxxxxxxxxxx0005 in the name of IceGold OU.  On

March 16, 2007 I received $93.03 ($100 minus the service fee collected by IceGold) worth of e-

gold transferred into my undercover e-gold account number 4170999 from IceGold's e-gold

account number 37273.

95.    IceGold has been utilizing e-gold account number 372 since July 2000 and 37273

since September 2003 for its operations.  Analysis of activity occurring in e-gold account number

372 revealed an extremely high number of transactions.  From January 2006 through October

2006, for example, the analysis yielded the following results: There were a total of 20,071

transactions for this 10-month period with a total weight of 192810.66398 ($115,508,709),

comprised of 10,553 transactions into the account with a weight of 96832.08416 grams

($57,960,516), and 9,518 transactions out of the account with a weight of 95978.57982

($57,548,193).  The analysis also revealed that IceGold customers with total activity exceeding

$100,000 represented $78,565,248 of the total $115,508,709 account activity.  Twenty percent

(20%) of this activity ($15,541,942) resulted from e-gold account holders with United States

addresses.  An additional one percent (1%) of this activity ($1,560,455) resulted from e-gold

account holders with non-U.S. addresses, but whose transactions originated with U.S. Internet

Protocol (IP) addresses (indicating that the non-U.S. addresses were bogus and that the account

holders were actually U.S. citizens).  As of March 2007, approximately 56.824415 grams

($37,453) remained in e-gold account number 372.

96.     Analysis of activity occurring in e gold account number 37273 from September 2003 through March 2007 yielded the following results:  There were a total of 57,696 transactions with a total weight of 55348.45387 grams ($31,815,473), comprised of 515 transactions into the account with a weight of 27683.6275 grams ($15,910,889) and 57,181 transactions out of the account with a weight of 27664.82637 ($15,904,584).  As of March 2007, approximately 16.530842 grams ($10,895) remained in e gold account number 37273.

* * *

I, Roy Dotson, a Special Agent with the United States Secret Service, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Affidavit is based upon reports and information known to me and/or furnished to me by law enforcement agents, and that everything represented herein is true and correct to the best of my knowledge and belief.

Executed on this ____ day of June, 2007.

/s/

_____
                    Roy Dotson
                    Special Agent, USSS

E 07-1336
RMC

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS All Property In/Underlying E-Gold Account Numbers: 808080, 808081 AND 808082 |
|---|---|
| United States of America | |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _11001_ (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____ (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
William R. Cowden        (202) 307-0258
Laurel Loomis Rimon
Assistant U.S. Attorneys
555 4th St., Room 4824
Washington, DC 20530

ATTOR

Case: 1:07-cv-01336
Assigned To : Collyer, Rosemary M.
Assign. Date : 7/24/2007
Description: General Civil

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

☐ **A. Antitrust**

☐ 410 Antitrust

☐ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

☐ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

☒ **E. General Civil (Other) OR F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☒ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

**No Summons Issued**

| □ **G.** *Habeas Corpus/ 2255*<br>□ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ **H.** *Employment Discrimination*<br>□ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ **I.** *FOIA/PRIVACY ACT*<br>□ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ **J.** *Student Loan*<br>□ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| □ **K.** *Labor/ERISA (non-employment)*<br>□ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ **L.** *Other Civil Rights (non-employment)*<br>□ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ **M.** *Contract*<br>□ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ **N.** *Three-Judge Court*<br>□ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding  □ 2 Removed from State Court  □ 3 Remanded from Appellate Court  □ 4 Reinstated or Reopened  □ 5 Transferred from another district (specify)  □ Multi district Litigation  □ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

18 U.S.C. § 981(a)(1)(A), forfeiture of property involved in a transaction in viol. of 18 U.S.C. §§ 1956 and 1960; 18 U.S.C. § 981(a)(1)(C), forfeiture of property derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity".

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐  ACTION UNDER F.R.C.P. 23   **DEMAND $**    Check YES only if demanded in complaint

**JURY DEMAND:** □ YES  ☒ NO

**VIII. RELATED CASE(S) IF ANY**  (See instruction) ☒ YES  □ NO   If yes, please complete related case form.

DATE  July 23, 2007   SIGNATURE OF ATTORNEY OF RECORD   WILLIAM R. COWDEN

Assistant United States Attorney

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**

Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

RECEIVED

JUL 2 4 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT